## KINSWORTHY ET AL. VS. MITCHELL & WIFE.

The assessor called on the agent of a resident land owner for a list of her taxable property; the agent furnished a list, but omitted one of the tracts of land: the assessor copied into his assessment list, a list of certain lands with their value, under oath, returned by a stranger as subject to taxation in the county, and which was on file in the clerk's office, on which the omitted tract was listed as the property of a non-resident: *Held*, that this in no way impaired the validity of the assessment.

It is no objection to the validity of a tax title, that the lands were assessed to non-residents, who had no title thereto, and not to the owners who reside in the county, and had sufficient personal property to pay the taxes: nor in such case that the collector sold the lands without first demanding the taxes, or resorting to the personalty.

Where a tract of land is assessed for the taxes of several years, and the taxes have been paid for one or more of the years, but the land is offered and sold for the whole amount assessed, this is an irregularity that renders the sale void.

Where the owner purchases his own land at an illegal tax sale, and assigns the certificate of purchase for a valuable consideration, etc., he will be estopped to deny the title of his assignee or those claiming under him, on the ground that the tax sale was void.

*Appeal from Hempstead Circuit Court in Chancery.*

Hon. SHELTON WATSON, Circuit Judge.

S. H. HEMPSTEAD, for Mitchell and wife.

There was no listing or assessment of these lands for taxation for 1851, by the sheriff, in the sense contemplated by law; no valuation by the only authority competent to make it—and all the sheriff pretended to do was to adopt the unauthorized and illegal private work of Williams. Without any investigation about it, or knowledge of it—without changing it in form or substance—with all its errors, infirmities and imperfections, it was embodied into the regular assessment list of 1851. Such an assessment or listing, if so it may be called, can never be the foundation of a valid tax title; and must be treated in all places as a nullity. It lacks all the requisites of a legal assessment. *Bayley vs. Lockhort*, 4 *Yerg*. 569; 24 *Miss*. 621; 15 *Ill*. 218; 2 *Mich*. 486; 3 *Selden* 517; 15 *Barb*. 343; 3 *Yeates* 284; 3 *Denio* 598; 8 *Blackf*. 350.

Unless lands are listed in the mode and manner prescribed by law, the sale of them for taxes is void. *Barker vs. Hesseltine*, 27 *Maine R*. 354; *Thurston vs. Little*, 3 *Mass*. 429.

If an assessment is not made in conformity to law; or not returned and filed within the period prescribed by law, it must be treated as a nullity, and a tax sale depending upon it is void. Such is the uniform language of all the authorities. *Thayer vs. Stearns*, 1 *Pick*. 484; *Kinney vs. Beverly*, 2 *Hen. & Munf*. 318, 344; *Thames Manufacturing Co., vs. Lathrop, et al.*, 7 *Conn*. 550; *Marsh vs, Chestnut*, 14 *Ill*. 223; *Billings vs. Detten*, 15 *Ill*. 218; *Blackwell on Tax Titles*, 144. 145; *Sharp vs. Johnson*, 4 *Hill* 92.

It is, however, insisted on the part of the appellees that the assessment list of Williams, being carried into the regular assessment list of 1851, became good by the adoption of the sheriff; and it is upon this ground that they hope to sustain their tax title.

.In many cases a person may adopt the act of another, and make it his own. A subsequent ratification is equivalent to an original authority. But I reply first, that the fact does not exist;

for all that Sandefur, the sheriff, did was to transcribe these lands from Williams' list, into the assessment list of 1851, *under the order of the County Court;* second, that the sheriff could not adopt the supplemental list, so as to make it legal. It was simply an impossibility; because that supplemental list was wholly unauthorized—Williams was not an officer, either *de facto* or *de jure*—nor was it made out under color of authority.

WATKINS & GALLAGHER, contra, contended that the assessor had the right to embody in his own assessment list the lands on the list returned by Williams, and on file in the County Court; that it made no difference where he got his information in respect to the lands which the owners had failed to give in for taxation; that it was his duty to avail himself of any and every source of information that would aid him to discharge his duty; that when he embodied the lands, on the list in the County Court, in his own assessment list and returned it to the County Court, it was as much his own assessment as if the lands had been furnished him in the ordinary way.

Mr. Justice COMPTON delivered the opinion of the Court.

The bill in this case was brought by Ezekiel and Burton H. Kinsworthy for confirmation of the sale of certain tracts of land described as the west half of section 6, north-west quarter of section 7, and the south half north-east quarter of section 27, township 13 south of range 25 west, which had been sold by the sheriff for the taxes assessed thereon, for the years 1848 to 1851, inclusive.

*Charles B. Mitchell* and wife *Margaret A.,* appeared and answered the bill. They urged several objections to the validity of the sale, set up title in themselves, and making their answer a cross-bill, prayed that their title might be quieted, etc.

On the final hearing the court decreed the relief sought by the original bill as to all of the lands in controversy, except the south half north-east quarter of section 27, as to which the sale was declared void, and the court being of opinion that the title

thereto was in the said *Charles B. Mitchell*, quieted the same. From this decree both parties appealed.

1. The first objection urged to the tax title is that the lands were not assessed by an officer legally authorized to make the assessment.

It appears from the testimony bearing upon this point, that the County Court, at January term, 1850, made the following order:

" The court being satisfied from the representations of John B. Sandefur, as sheriff of Hempstead county, as well as from other sources of information, that there are many tracts of land lying in the county, owned by citizens and non-residents of this State, which had not, for many years past, been furnished to the assessor of said county, and on which no taxes have accrued to the county revenue, and it being a work of much difficulty to ascertain a correct list of said lands—which the sheriff states he is unable to perform. It is therefore ordered by the court, that for the purpose of securing to the county the benefit of the taxes due on said lands hereafter, that *Daniel E. Williams, esq.*, shall be entitled to receive all the taxes now due, and which may become due for the year 1850, when collected, on any and all lands lying in Hempstead county, and which are not now regularly assessed for taxation, provided he furnish the sheriff with a correct list thereof, from the public surveys, entries, maps and records of this county."

Pursuant to this order Williams made a list which he verified by affidavit, and filed in the clerk's office. In form, it was an assessment list, and embraced, among others, the lands in controversy. At July term, 1860, it was laid before the County Court, and the court, after fixing the rate of the State and county taxes to be levied on the assessed value of the lands, ordered the clerk to make out duplicate tax lists " in the same manner as in other cases," one of which was to be forwarded to the auditor of public accounts, and the other delivered to the collector of the county revenue, with the usual warrant thereto attached.

OF THE STATE OF ARKANSAS. 149

TERM, 1860.]        Kinsworthy et al. vs. Mitchell & wife.

The County Court, however, seems to have doubted the legality of these proceedings, and at October term, 1850, made the following order:

" Whereas, it appearing to the court, that there is likely to arise difficulty and contention with various persons charged with back taxes in the supplemental assessment and tax list, made under a former order of this court, by Daniel E. Williams, who was appointed for that purpose, growing out of the fact that the laws of this State are vague and indefinite on this subject, and do not authorize or prescribe the mode or time of making supplemental assessments, and the court not being fully informed of its legal powers in this behalf, nor of the validity of said supplemental tax list, and it further appearing that a large number of the debtors have positively refused payment as charged in said list, and the court not wishing to involve the collector and such delinquent debtors in expensive and vexatious suits at law, to ascertain the legal effect of the said supplemental tax list, and the time being near at hand, when all such delinquents can be presented on the regular annual assessment list for the year 1851, under the general provisions of the revenue law of the State. It is, therefore, ordered by the court that John B. Sandefur, as sheriff and *ex-officio* collector of Hempstead county, be authorized and directed to desist and suspend all efforts to make collection of the taxes as charged in said list, and that he be held responsible to the county for such sums only as he may have received by the voluntary payment by persons charged—and the court, in view of all the facts, would recommend to the Auditor and Treasurer of the State, the adoption of the same rule of settlement as to said supplemental list—and that this order be duly certified to the Auditor and Treasurer of the State."

In the regular assessment list for 1851, the lands in controversy were listed, not only for that year, but also for 1850, 1849 and 1848, as lands belonging to non-residents; and the assessor states in his deposition, that in thus listing and assessing the lands, he copied from the list previously made out by

*Williams*, and that he listed and assessed them for taxation in no other way—the agent of Mrs. Mitchell having furnished him a list of her taxable property, but failed to embrace in it the lands claimed by her in this suit.

That the list made by *Williams* was not, according to our revenue law, a valid assessment, is too plain for discussion. It was simply void. The lands, however, were not sold under this assessment, and the real question is, whether the act of copying from *Williams'* list into the regular assessment list for 1851, under which they were sold, vitiated the assessment. It is insisted that it did, and the argument is, that the owner of land, whether he be resident or non-resident, is entitled to have his land assessed according to its value, with a view to quality and fertility of soil, local advantages, and the improvements thereon, which implies a personal knowledge of each tract of land assessed, and which the assessor cannot be supposed to have without personal observation and examination.

To determine this question, it is necessary to refer to our statutory provisions touching the manner in which the value of lands assessed for taxation is to be ascertained. ,

Sections 14, 15 and 16 (*Gould's Dig. chap.* 148,) make it the duty of each resident tax payer to give to the assessor a description of all his taxable property—describing each tract, lot or parcel of land separately—with its value, and when the assessor has made a schedule thereof, it is to be sworn to by the tax payer, or his agent, as being the full amount of property owned by him subject to taxation, together with its true value.

By section 20, it is provided that if the tax payer neglect or refuse, when called on, to furnish the assessor with a list of his taxable property, as required by law, or if the assessor have reason to believe that the list so furnished is fraudulent, or does not contain a correct list of the property owned by such person, the assessor shall ascertain, by the best means in his power, the taxable property and the value thereof, and, as a penalty for such neglect, shall assess it at double its value. Sections 23, 25 and 29 provide that each non-resident owner of land shall,

on or before the 25th day of March, in each year, file or cause to be filed in the office of the Auditor of Public Accounts, or with the assessor of the proper county, verified by the oath of himself or agent, an accurate list and description of his lands, with the local advantages thereof, and the number of acres in each tract; and that if he fail to do so, the assessor shall ascertain, by the best means in his power, what lands, in his county, are owned by such non-resident, and their value, and assess the same at double value, as a penalty for non-compliance with the provisions of the act.

From these provisions, which were in force at the time the assessment in question was made, it will be perceived that where the resident or non-resident owner failed to furnish a list of his lands subject to taxation, as required by law, it was made the duty of the assessor to ascertain their value as he best could. The Legislature had prescribed no mode in which he was to discharge this duty, as, whether by actual personal examination, or otherwise—had indicated no particular source or means of information, and required him to avail himself of it; and the courts will not undertake to do what the Legislature alone could have done, and did not do. In the language of the act, the assessor was to get the information " by the best means in his power." What those means were, was left to his sound discretion, exercised under the sanction of his official oath. In the case before us, the County Court ceased to treat the list made by Williams as a valid assessment. It remained on file, however, in the clerk's office, and the assessor in making out his list for 1851, availed himself of the information it contained. That was all the act of copying amounted to, and the Court is of opinion it impaired in no way the validity of the assessment, and, besides this, it is not pretended that an excessive valuation was put upon the lands.

2. The second and third objections may be considered together. They are, that the lands were assessed to non-residents, who had no title thereto, and not to the owners, who resided in the county, and had sufficient personal property to

pay the taxes; and that the collector sold the lands without first demanding the taxes, or resorting to the personalty.

There is nothing in these objections.

In *Merrick & Fenno vs. Hutt*, 15 *Ark*. 331, in which the validity of a tax title was involved, it appeared that the land had been assessed in the name of James Daniels as a non-resident, and also that of James T. Stark, who was a resident. The latter was the equitable owner of the land, the naked legal title being in one Lindsey. It did not appear that Daniels had any right to the lands. He was, however, a non-resident, and the land was proceeded against for the taxes of 1840 as his property. It was advertised and offered for sale as such, at the time and place prescribed by law, and there being no bidders it was forfeited to the State in the name of Daniels. The taxes for 1840 were not paid on it by any one, either as the property of Daniels or Stark, nor did it appear that any steps had been taken that year to collect the taxes from Stark, who was shown to have been able to pay them. The land remaining unredeemed for two years, was sold by the Auditor for the taxes, and Hutt became the purchaser. In that case, the identical objections which we are now considering, were pressed in argument, and the Court said:

" The objection principally urged against his" (Hutt's) " title, is, that Daniels was not the owner of the lot at all, and that it was improperly taxed in his name, and that the sale to Hutt was void. But the statute answers that objection, by declaring that ' no sale of any lands or town lots, for the payment of taxes, shall be considered invalid on account of its having been charged on the tax book in any other name than that of the rightful owner, if such land or lot be in other respects sufficiently described in the tax book, and the taxes, for which the same is sold, be due and unpaid, at the time of such sale.' *Dig*. 952.

" This provision is founded in sound policy. In the new States, where lands are cheap and abundant, and there is almost an entire absence of that strong attachment to the soil, which exists, in a striking degree, in older communities, con-

veyances of real estate are constantly made from one to another. The owner to-day ceases to be so to-morrow. If it were necessary to go into questions of actual ownership, the land taxed would indeed be in a precarious condition, since changes of ownership, either real or simulated, would render the collection of a tax difficult, if not impracticable. The name of the owner is comparatively unimportant. The description of the land in such manner as that it may be identified, and the non-payment of the tax, are the two considerations of the most importance in a tax sale. Indeed, the latter is vital, because no matter how formal and exact the proceedings may have been, whenever it is made to appear that the taxes have been paid by any one, the sale is utterly void. The authority to sell is founded on the fact of non-payment. The statute intended to divest the title of the former owner for the non-payment of the tax, and for that only. The particular land taxed stands liable for it, no matter who may be owner, or into whosoever hands the lands may pass. The State has, by express legislation, made the tax on lands a charge against them, notwithstanding any change of title by deed, judgment or otherwise. (*Dig*. 948.) And this is not only constitutional, but entirely proper, in any point of view in which it may be considered. It is a proper preference for a State to give herself, in order to insure certainty in the collection of the means necessary to carry on the government. * * * * * * If the statute is to be enforced at all, this objection to the title of Hutt, acquired at tax sale, cannot prevail; for it was to meet such cases that the provision was made as to taxing property in the name of a person not the true owner. * * * * * * The law requires the owners of land to see that the taxes are paid; and if they neglect it, they, or any one claiming under them, have no right to complain of the consequences of their own negligence. If, for disregarding the first and highest obligation a citizen owes the State, the loss of his property, charged with the tax, shall seem a disproportionate penalty, it must be remembered that to excuse it would produce the most serious

11

embarrassments, if it did not eventually work the destruction of civil government itself. * * * * * The right to sell does not depend on the fact whether the property is taxed in the name of the rightful owner, but on the fact that the taxes are due and unpaid; and that the land is charged with them, to which charge or lien all claims or pretensions must yield, and of which all persons must take notice at their peril."

The lands, in the case before the Court, having been assessed to non-residents, who had no title to them, instead of the owners—and we have seen that this did not invalidate the assessment—the law did not require the collector to look to the owners, or sell their personal estate for the taxes, as is required by *sections* 66 *and* 107, *chap.* 148, *Gould's Dig.*, in cases where the lands are assessed to residents, even though the owners resided in the county; but required him to proceed at once against the *lands* as the property of non-residents, in the manner prescribed by the statute, without making it necessary that he should first demand the taxes or resort to the personalty. See *Eng. Dig.*, *secs.* 95, 96, *et seq.* · He was required to proceed against the lands *as they were assessed*, and not otherwise. What authority had he to demand the taxes of the rightful owners, or to sell their goods in such a case? Was he not to act in conformity to the tax book, which was but a copy of the assessment? See *Gossett vs. Kent*, 19 *Ark.* 602, where the mode of selling the lands of resident and non-resident tax-payers for the non-payment of taxes, is discussed.

3. The objection that the several tracts were not sold separately, each for its own taxes, has no foundation in .fact.

4. The remaining objection applies to the south half of the north-east quarter of sec. 27 only. It appears that this tract was assessed for 1850 and 1851 to *Mitchell*, who claimed to be the proprietor, and paid the taxes for those years. It was also assessed to *S. Gray* or *Matthew Gray's Heirs*, as non-residents, and sold under the latter assessment for the taxes of 1848 to 1851 inclusive. The result was a sale of the land for the taxes for four years, when the taxes for two years only remained

unpaid. This was an irregularity which rendered the sale void as to this tract. The law provides that the person offering at the sale to pay the·taxes and penalty charged on any tract or lot of land, for the least quantity thereof, shall be· the purchaser of such quantity. *Dig.*, *sec.* 119. In view of this provision, if the sale, when made for a greater amount of taxes than was really due and unpaid, were held valid, cases would constantly occur where a greater quantity would have to be sold for the payment of the taxes claimed, than it would be necessary to sell if the correct amount were charged. See *Stitson vs. Kempton*, 13 *Mass.* 282; *Elwell vs. Shaw*, 1 *Greenleaf* 339.

It is insisted, however, for the complainants in the original bill, that *Mitchell* is estopped to deny the validity of their title. And of this opinion is the Court. At the sale for taxes *Mitchell* became the purchaser of the land, believing it to be his own, and took a certificate of purchase, which he afterwards, for a valuable consideration, assigned to *Williams,* who, on producing to the collector the certificate thus assigned, obtained from him a deed to the land, bearing date the 20th November, 1852; and Williams, by deed of the 17th of November, 1853, conveyed to the complainants.

A clearer case for an application of the doctrine of estoppel *in pais*, does not often occur. Technical estoppels are by deed or matter of record. But there are other acts and admissions less solemn, which may have the force to conclude the party, and are said to operate as estoppels *in pais*. The general rule is, that when a party, either by his declaration or conduct, induces a third person to act in a particular manner, he will not afterward be permitted to deny the truth of the admission, if the consequence would be injurious to such third person, or to some one claiming under him. This rule, in its application to business transactions, is founded in principles of practical morality and fair dealing. And no portion of the law of equitable estoppel is of more importance than that which applies, when a sale made without authority or title,·is sanctioned at

the time or ratified afterwards by the owner, and makes the title of the purchaser valid, by imposing silence on the only person entitled to contest it. See *Welland Canal Co. vs. Hathaway*, 8 *Wend.* 483; *Reid vs. Hensley*, 2 *B. Monroe* 254; *Chapman vs. Searle*, 3 *Pick.* 38; *Bird vs. Benton*, 2 *Dev.* 179; *Governor vs. Freeman*, 4 *Ib.* 472; *Stonard vs. Duncan*, 2 *Campb.* 344; *Pickard vs. Sears*, 6 *Adolph. & Ellis*, 469; *Gregg vs. Wells*, 10 *Ib.* 90.

By the assignment of the certificate *Mitchell* induced *Williams* to pay out his money and accept what the proof shows both parties then regarded as a good title to the land; and *Mitchell* will not now be permitted, on refunding the purchase money, as he proposes to do, to assail and defeat the title of those claiming under *Williams*, upon the ground that the sale was void. Such would be an injury to the complainants, which the law does not tolerate.

It results that so much of the decree as confirms the title of the complainants to a part of the land in controversy, must be affirmed; and so much thereof as declares the tax sale void as to the south half of the north-east quarter of section 27, must be reversed, and a decree entered here confirming the title of the complainants to this tract also, and certified to the court below.

Mr. Justice RECTOR, dissenting.

I differ in opinion from a majority of the court in this case.

The record shows that Mrs. Mitchell, in her own right, was the owner of two of the tracts of land in controversy; that she was a resident of the county, and had personal property from which her taxes could have been collected. This alone, I think sufficient to invalidate the sale. The authority given to the collector to sell the land of resident tax payers, is limited to those cases, where there is no personalty out of which to make the money. Nor can he enlarge the authority conferred upon him, by putting the lands, whether by mistake or otherwise, into the non-resident list. The facts are the same—that the

lands belong to resident owners, and are exempt from sale, where the owners have personal property. The power given to an assessor, or collector is a *special one*, and must be pursued strictly. *Parker vs. Overman*, 18 *How*. 142.

Embarrassment may sometimes ensue to the assessor, in determining whether lands belong to resident or non-resident owners. But the Legislature has not seen proper, thus far, to relieve him of that difficulty, by saying that he may assess them, either to the one or to the other, as convenience or caprice may dictate.

And in assuming to sell lands when he has no power to do so, the collector, by such sale, not only passes no title, but commits a trespass against the owner, for which he is liable to an action.

The citizen tax payer has rights, which as much deserve protection in courts of justice as the speculating purchaser, the officer, or the government.

For the burden of paying a perpetual, and never-ending tax, is sufficiently onerous to him, without being subject to ruthless and unlawful invasion, induced by the negligence or incompetency of officers, whose duty it is to protect his rights, rather than to invade them.

In this case, as in most others involving tax title, the delinquency begins and ends with the collector, and not with the tax payer.

By law, and express law, it was the duty of Sandefur, as assessor of Hempstead county, to have proceeded in person over the county, and have called upon every tax payer to give in their property under oath; and if they neglected or refused to do so, then it became his duty to assess them " as best he could."

But, instead of that, he neither called upon Mrs. Gray to give in her taxable property, nor assessed it himself " as best he could," for he testifies that he never did, in fact, assess the land himself, but copied into his own book the assessment made

by Daniel E. Williams, who was a private citizen, and who had no right to make an assessment at all.

In 1853, the Legislature passed an act requiring the tax payers to meet the assessor at the township precinct, and give in their property, and the same law imposed fifty cents penalty upon them if they neglected to do so, to be paid to the sheriff for the trouble of going to their places of residence.

But in 1851, when the assessment was made in this case, the law, and the universal practice was, to go to the people's houses and demand an assessment list under oath. And until this demand is made by the assessor, he has no right to assess property for taxes in any case, that is, resident property.

In the opinion of the majority of the court, however, this objection to the assessment and sale is cured by *sec.* 133, *chap.* 148, *Gould's Dig.* Which provides that no sale of lands shall be considered invalid on account of its having been charged in the tax book, in any other name, than the rightful owner, " if such land be in other respects sufficiently described in the tax book."

Taxing the land in the wrong name, is only a part of the difficulty in this case. The main objection is, that it was classed and sold as non-resident land when it was not.

And the officer had no power over it whatever, there being personal property out of which he was bound by law to collect the taxes.

The land was not, therefore, " in other respects, sufficiently described in the tax book." It was said to be one thing when it was another. It was described as non-resident when it was resident land.

And which distinctive designation given to it by the sheriff, becomes just as much a part of the description as any thing else said about it in the advertisement proposing to sell it.

Indeed, no other part of the description is looked to by the public as possessing so much significance as this leading feature in the sheriff's notice to sell.

I am aware, that not only in the case at bar, but also in that

of *Merrick & Fenno vs. Hutt*, 15 *Ark.* this court has held the contrary doctrine upon this point.

And although I accord great merit to the argument of the court in that case, still to my mind, the position is logically untenable, and against the clear import of the statute.

For these reasons I regard the sale made by the collector, of the tracts belonging to Mrs. Mitchell, (formerly Mrs. Gray,) wholly invalid, and the decree of the chancellor in the court below, erroneous.

The remaining tract, being owned by Mitchell, individually, and considering that he voluntarily became the purchaser of his own property, knowing it to be so, and for a valuable consideration transferred it to Williams, he is certainly estopped from denying his own sale and setting up title in himself, admitting the sale by the collector to have been, as it was, void.